The first case is Pearson v. NBTY, Mr. Frank. May it please the court, Theodore H. Frank for the appellants. This case presents a fairly straightforward application of this court's decisions in Eubank v. Pella, 753 F. 3rd, 718, and the September 19th decision, Redmond v. Radiachak. The Redmond ratio, which was 55% in Eubank and 67% in Redmond, is 84% here, where the attorneys requested $4.5 million and the class received less than $900,000. Given that is so straightforward, I'd like to move to an issue that these previous decisions didn't directly address, which is what the Ninth Circuit calls the kicker and what Redmond calls, I think more precisely, a separate fund or a segregated fund, and that's the fact that the attorney's fees were kept separate from the class recovery. So, though the defendants were willing to put $4.5 million on the table because that's what they thought the litigation was worth to settle. Now, of course, the plaintiffs point out that your game theory scenario doesn't take into account that the fee agreement must pass the scrutiny, you know, of a district court judge. So, if you'd respond to that, I'd be grateful. Well, they did so many things to protect the fee request from scrutiny. First of all, there is a clear sailing agreement that prohibits the defendants from challenging the fund at all, and second, by putting it in a segregated fund, a separate fund, it means that objectors have no financial incentive to challenge the fee award, qua fee award. If, even if they come in and object to the Rule 23H request and get the fees reduced, all the benefits redound to the defendant. And the objectors, under existing law at least, would not be eligible for attorney's fees for that success. So, only pro bono, non-profit, public interest type attorneys would come in and actually do that, and often that sort of scrutiny just is absent. Not while you're alive. But your time is finite. My time is finite. There are opportunity costs. And so, defendants faced a lot of risk that they would be on the hook for the full 4.5 million without, I think, the likely the court would have awarded the full amount because there would have been no scrutiny of the claims of the value of the injunctive relief. There would have been no scrutiny of the claims that the settlement was really worth 19.2 million because there never would have been disclosure of how much the class actually received because the fairness hearing was set before the claims deadline, and the parties argued before the court that they didn't need to hear that. And my experience is, is that courts don't ask for that unless somebody really fervently insists, and sometimes not even then. How do you have standing to respond to the cross-appeal? How are the how are the interests of the objectors affected by the cross-appeal? Because, I mean, increased fees wouldn't come out of the plaintiff's fund, right? That's correct. And we forthrightly acknowledge that in our jurisdictional statement in the third stage brief. The issue we put is that it should be treated as a constructive common fund, and that it goes to the fairness of the settlement. And the Third Circuit agreed with that analysis in GMC pickup trucks, that you're talking about one holistic settlement, and the fact that it was structured to pay the attorneys 4.5 million dollars for themselves, goes to the fairness of that, and Redmond agrees with that principle. So to the extent, there's that weird balance between 23E and 23H, and certainly winning on the 23H issue doesn't affect us, but to the extent that the 23H issue informs the 23E issue, it does affect us. I thought your point was that the argument that you and nobody else has standing to raise that challenge is the problem. And that's exactly right. That's exactly the problem with the segregated fund, or the separate fund, and it not only protects it from scrutiny, because at the end of the day, the defendants can't oppose. The district court is very likely to hear a one-sided presentation, and even if it hears a two-sided presentation, there's no basis for anybody to appeal, because if I were to just appeal the fee award and not appeal the fairness of the settlement, I wouldn't have standing to do that. And so it's a structure designed to protect the fee request from scrutiny, and even when the fee award is reduced, because it's put in this separate bucket instead of in a common fund, $2.4 million that the defendant was willing to pay to settle the case, whatever the merits of the case was, is going back in the defendants' pockets. In effect, class counsel breached their fiduciary duty to the class because they left money on the table that the defendants made very clear they were willing to pay. Well, I mean, what, the court found that $20 million was available to the class, but the court also seems to be well aware that the actual recovery was only $2 million, whatever. So it certainly seems as if the court weighed that potential and actual recovery against obstacles to any recovery, should the case have gone to trial. And so I'm trying to figure out what the error is in all of that. Okay. Well, unpacking both of that. Yeah. First of all, the court only reached the issue of what the actual recovery to the class was, because we objected, and the court postponed the fairness hearing, and demanded additional submissions to determine what those numbers were. Otherwise, we would have just seen the ex parte presentation. This is worth $19.2 million. There's some claims in, but gosh knows a lot of people are going to wait until the last minute to file claims, and you don't have to worry about it. Second of all, this court has already decided in Eubank and in Redmond that the issue is not the amount available, because you can always make a lot available. The issue is, what is the actual recovery of the class? It's very easy to create burdens to recovery or make the claim process more burdensome than it needs to be, and the defendant's own evidence shows this. In their argument that, well, the claim results might have been high, they themselves put in evidence in their supplemental appendix that wasn't there below, of a California State case where the claims process insisted of individualized notice that says, you are entitled to recovery, and this is how much we think you're retitled to. Here's the number you put in, and you can make that claim. Whereas in this case, everybody got a postcard, that said, you may be a member of the class, go to a website and try to figure it out, and if you go through all that work, maybe you'll get three dollars. Mr. Frank, can I follow up on the Boeing against Van Gamert issue here? I'm not sure how completely that may have been resolved by our prior decisions, nor am I sure it's been superseded or abrogated by subsequent legislation or the rulemaking. However, obviously, there's a lot of rumbling about that principle and how broadly it should be applied. As I've been wondering about this, when we, when courts award fees under fee shifting statutes to prevailing parties, they are, of course, required to look at the actual results and benefits to the plaintiff. And I wonder, you know, that was not relevant or applicable, as I understand it, in Boeing against Van Gamert. There would not have been fee shifting statutes, I don't think. And if that's correct, then perhaps we might say that if you are working under fee shifting statutes, such as some of the consumer protection statutes here, then it would be at least permissible, it may be required, to look at the actual net benefit to the class before deciding what a reasonable fee is. I think the paradigm we put forward in our brief, that Boeing is a 23H case, though there wasn't yet a 23H, and this is a 23E settlement fairness case, is the way to look at this. Because if you go with their proposed rule of decision, then Eubank was wrongly decided, because there's no question in that case that $90 million was made available. If everybody submitted a valid arbitration claim, there would have been $90 million awarded to the class, and then the $13 or $11 million fee award would have been reasonable. And there would have been any question of one-sidedness. And the same is true in Redmond, where the entire multi-million member class had $10 coupons available to them, but only 83,000 claimed them. And again, if it was a question of availability, that settlement was arguably fair. So the availability metric, I think, is very important because, I mean, we put forward some hypotheticals in our briefing. You get some really absurd results on settlement fairness if you say what's available. How large is the potential class here? It was, I think, a 16 million member class, and then 4.7 million got individualized notice. Right, 16 million. So, and the maximum excuse me, 12 million. I don't want to exaggerate. $50 or what? I forget what that is. I think with... But even if it were 10 million, that would be 160 million. Wouldn't that be the logic of the settlement? The way they structured it in terms of availability, they said go ahead and disregard the 7 million members who didn't get individualized notice. 4.7 million did get individualized notice. They could have each claimed $3 and then add in the attorney's fees and add in the 2 million dollars of administration costs, which this court said in Redmond was not an appropriate thing to do. That gets you to 19 million. I'm into my rebuttal time. Okay, thank you, Mr. Frank. Mr. Welkman? May it please the court, I'm Stu Welkman, Sir Welkman, on behalf of the appellees, cross appellants, and I'd like to address primarily our cross appeal, if I could. I have something I want to discuss with you, please. Because I am very skeptical of the value of the injunction that required the label change here. It seems that very similar language was allowed to remain on the side of the package. Other than speculation, what is there in the record to support any value for moving similarly deceptive language to the side of a package? I mean, unless that expert report distinguishes between the old label and the new label, the report seems to be a very limited use in deciding the value of the injunction. I'm happy to respond to that, Your Honor, because it's something that Mr. Frank has raised in his papers, and we addressed it, but I think what you first have to do is understand the target market who's the target market for these products, which are primarily people who have osteoarthritis. Osteoarthritis. I'm sorry, osteoarthritis. They have arthritis. The target market, and that's in the record, okay? The products are marketed to relieve the common symptoms of arthritis. There are two veins of representations that are made about these products. One I'll call the paleation representations or comfort mobility. Could you get to the point? Okay, I will get to the point. The point is is that there is a material difference between rebuilds, renews, revitalizes, and strengthens, which is the key term that I think Your Honor is focusing in on. And for osteoarthritis patients or subjects or victims, rebuilding, renewing, revitalizing is the holy grail because you have a condition where you have degenerated cartilage. What are you driving at? I don't understand you. What is this to do with the injunction? The rebuilds, renews? Yeah, what exactly? Because it's being removed from the labeling. What does this have to do with Judge Rovner's question? I thought I was answering her question. I'm sorry. Look, I don't understand a 30-month injunction. Does that mean that for 30 months you can't deceive the consumer? But at the end of 30 months, yeah, back to the misleading representations. Well, Your Honor, I think if you take a look at it, it's probably stronger than most FTC consent decrees. Well, answer my question. What is the point of a 30-month injunction against misleading advertising? Labeling, and then at the end of 30 months you go back to the misleading labeling. Because that's not the way the agreement is set up. The agreement is set up that if they do go back to that deceptive labeling again, they will be subject to a lawsuit. If they don't, but that doesn't make any sense. If you're going to, if you go back to that and then you're sued, what have you gotten from the 30-month limit on the injunction? Why isn't it a perpetual injunction? But of course the defendant can always go into court and say, you know, conditions have changed and therefore we want a modification or termination of the injunction. Well, Your Honor, I've never seen anything like this before. Well, Your Honor, if the negotiations were that, that would be the situation. If they were to go back to the label, the science... What is the point? I don't understand it. What do you gain by having a 30-month cut-off instead of a perpetual injunction? Well, from my perspective, the gain is if it's no longer on the labeling and they're going to have to make a decision to put it back on. And so that in itself is an achievement because it's been on the labeling for over 10 years. So now for a 30-month... That's an achievement? I don't understand. Well, I believe it's actually probably an unprecedented achievement, but I obviously you have your doubts, but... Mr. Weltman, on a different subject, I'd like to talk about the way the fee, the fees were structured in the settlement agreement. With the separate fund and a clear sailing agreement for four and a half million dollars, can you explain to me how that combination of features is a benefit to the class? Well, I've been doing this for almost 36 years and most of the settlements that I have entered into have that feature and component. That's not responsive to my question. I'm sorry, and let me explain to you why... I've seen plenty of them before, right, as well. So let me explain to you why I think it's a salutary procedure because what we do, at least from my perspective as class counsel, I feel the most important thing for me is to negotiate the benefits to the class first without any mention of fees. In fact, that's what I do all the time. I refuse to talk about fees because I want to maximize the recovery to the class. You know, reading this case, you never would believe that. I mean, in this instance, the defendants, you know, agreed to pay class counsel more than twice as much as, you know, the class could possibly ever end up recovering. Why isn't that a red flag to a district court on the fairness of a deal? Well, because we believe and I perceived that the injunctive relief was the most valuable component of the settlement. But you literally moved almost the same wording from the front of a package to the side of the package. Well, I would submit to you that we didn't because we removed the length. The rebuilds, revitalize and renews is repeatedly made throughout the labeling and has been for 10 years. The word strengthens appears on maybe a footnote in one or two labels. So clearly the messages that the defendant wanted to impart to consumers for the last 10 years are the ones that they chose to make and rebuilds, renews and revitalize were the ones that they were making for 10 years. Strengthens was not because it means nothing. Did you conduct a study of how, you know, consumers react to these different words? Not in connection with the settlement, no. Well, that's very surprising because after all, the question is, what interpretation is the consumer going to place on these different formulas, right? Well, Your Honor- Do they distinguish between revitalize and strengthen? I mean, that's- Well, Your Honor, if you're saying that in order to justify the settlement, we should have conducted a consumer survey- Absolutely. All right. Well, then I submit to you that what will happen is that we will not, the bar will not seek injunctive relief because in order to get it, we're going to have to outlay maybe $100,000, $200,000 to justify the settlement. Wow, to get how many million in return in these cases. But we're not guaranteed of getting any of that. Oh, let me ask you about your legal fees. Sure. How much of the legal fees are generated for partner work as opposed to associate work? Well, I couldn't off the top of my head give that breakdown. Is it in the record? It's certainly in our fee petitions, yes. The breakdown between the partners and the associates? Yes. Could I repeat my question? I'm sorry, if I didn't answer it. Sorry, my fault.  over benefits to the class and fees when every defendant we hear from tells us, look, our concern is the total amount we're going to pay. We're indifferent to cash as between class, Cypre and attorney's fees. Well, in this case, again, we negotiated the class benefits first. Why? Because- How does the class benefit from that? Well, the class benefits because we got as much as we could for the class first and then addressed fees based upon what we got. That's the way we did it. What did you get for the class? I was just- The problem with that is that a defendant negotiating in that context has to, if they know that they're going to be negotiating fees separately, they've got to hold back. They're interested in a total cost. Why isn't your class better off by simply saying, let's find out how much the defendant is willing to pay here, combination of injunctive relief and cash, and then we will ask the judge to give us a reasonable fee award? Well, because here we had an uncapped settlement where the class could get as much as they claimed within the parameters of the settlement claims. So that- Nobody could have taken that seriously, right? I mean, surely you all didn't expect all the class members to claim, right? You couldn't have been too surprised by the- What was the guarantee? It was what? Two million or so? Well- Guarantee- Your Honor, I will continue- Please answer. Please, yes. And I'm more than happy to. We had every hope and anticipation with the robust notice program that we provided- No, you didn't. Okay. Because this- your website is very confusing. It's extremely confusing. I can't figure the first- first you go to the website and there's a very confusing business and all sorts of important documents you're supposed to look at. Finally you find this 10-page claim form. Very confusing. For $10, how many people- or $3 or whatever it's- Three-  How many people are going to fill out that? Well, 1 in 10- what? 1 in 10,000? Is that what it is? Well, Your Honor, I can't argue with- I believe the claim forms were- No, they're not. Okay. They're not. They're made up to discourage people from applying. And you get a very, very low turnout. Very low. Okay. Well, the red light is on. I hope I've answered your questions. Thank you, Your Honor. Okay. Thank you. Mr.- well, no. Mr. Hockman? Good morning, Your Honors. May it please the Court, Rob Hockman for the defendants. Mr. Hockman, I would like to continue on the train that we just were on. Because I have had trouble accepting the level of surprise at the low claim rate. I'm wondering who would file a claim for $3 if the claim form required you to state under penalty of perjury what month you bought a bottle of pills several years ago. I would also think that experienced class action lawyers, which all of you are, know with a fair amount of certainty how many people are going to file claims. I would have thought that you would have hired experts to predict the size of the payout before you sign off on a settlement. What I've been wondering while reading all of this is whether we need hard evidence of collusion or can a claim form be so onerous that a court should assume something is amiss? Well, I think this Court's case says that certain circumstances are suspicious and warrant special scrutiny. I think with respect to the claim form, what you have to keep in mind is that from the What we're thinking about is this settlement is an alternative to litigation. No doubt there were low claims made and it was because, for a variety of reasons, I think the claim form actually is, as these things go, for experienced people That's not a good answer. Of course as these things go, because the company wants as few claims filed as possible. So in all the cases we see these impossible claim forms. There is no reason to have a 10-page claim form for a $3 claim. No doubt it can be simplified. There's no doubt it can be simplified. So why should the settlement be approved if the claim form can be simplified? Why doesn't the judge say, simple form for $3 claims? What's the excuse for this? I think that when you sit down to do these things, one of the things that you're concerned about is that you're going to give misleading information or incomplete information. You're going to deter the ability of people to file as many claims as they have based on the number of purchases they've made. The key thing here, though, is the alternative is litigation. And at the end of a judgment, what we asked to be shown here is merely an estimate, within a month of when you purchased these products, no other proof, your mere statement alone. If this goes to trial, and you have a judgment, and you're entitled to claim a recovery of some portion of your purchase, but that's the alternative at the end of the day. No, that's not the alternative. The alternative would be a reasonable settlement. Well, certainly, no question about that. Do you endorse this absurd suggestion that this settlement is worth $20 million? We've taken no position on that, Your Honor. We are not taking a position on the amount of fees. What we're here to do is say that this settlement, whatever you do to the fees, and you can go in any direction, that's obviously at your discretion, but whatever you do to the fees, the settlement agreement provides meaningful relief in the situation of a case that faced substantial obstacles going forward. One in 10,000 members of the class. I'm sorry, I didn't hear that? One in 10,000 members of the class. No doubt it's a small claim percentage, but if it had gone to trial, I'm not sure you would have seen a much larger claim percentage, because the damages that would likely be available to an individual was never going to be substantial in this case, and the proof would have to be more, more than we provided for, we allowed for in this case. If we disapprove the settlement, does that mean there's going to be a trial? Is there going to be a renegotiation of the settlement? This is an important fact about this case. This case is not like the Bluetooth or the RadioShack case, where the settlement took place very early in the litigation. This case took place after extensive discovery, including expert discovery, discovering one of the cases had been closed. Another case out in Massachusetts was pending a, what the judge there calls an exemplar trial. It was a trial of an individual claim that was going to help, in his view, his procedure, help inform whether to certify a class. These cases were far along, Your Honor, and that's an important fact here, because I think that casts doubt, or at least reduces the suspicion on the segregated issue of the fees. When you look at it from our perspective and what we care about, and remember, plaintiffs have to negotiate with us. They have to, when we have a concern, they have to respond to it, and our concern in a case like this, when we tie off a settlement that has a much simpler claims process than would be at the end of litigation, and we say, we put that out there and we give them their injunctive relief, and it's uncapped, we then turn and we say, what's our exposure on fees, and we have exposure on fees in this case, because there's substantial time already into the case. We don't know how a court is going to value it, so we say, what we want is a cap on our exposure on fees. We don't have a cap on the class side, but we want a lid on our recovery. That's a value to us. Without taking anything away from the class, that matters to us. And so we get that in this kind of case, and I think this court has been very clear in every case that they've dealt with these structures, you've never said it's always impermissible. You said it's worthy of scrutiny. How do you think the Pella case, that came out shortly after you filed your brief, how do you think that fits into this? Well, I'll tell you one thing that this court's cases, including Pella, and more than a decade now of this court's cases tells us, is that when we agree to this cap on fees, that's not putting $4.5 million on the table. It's saying we'll pay whatever the court thinks is appropriate, but we know that courts are going to scrutinize this. And the Pella case, Your Honor, very specifically, the reasons for suspicion there are off the charts different from this case. I mean, just taking one simple fact, the payment of an advance of fees in that case just raises all kinds of red flags about collusion between counsel at the expense of the class in that case. There's no whiff of anything like that here. This is what is called tacit collusion. Understood that that's the allegation. No question. And what I'm trying to suggest is that a structure like this, in a case like this that has advanced much further along than Bluetooth or Radio Shack had advanced, where we know the plaintiff's In the absence of actual evidence of collusion, is in your mind there some ratio of attorney's to class recovery, which a court should presume or possibly suspect that something is amiss? I will say this, because again I'm bound not to take a position with respect to the fees that counsel is entitled to. We know when we agree to this cap to limit our exposure, we know that one of the factors that's going to play a significant role in the court's evaluation of the fees in this case or any class case is the value of the recovery to the class. Now Mr. Weltman explained that that provides him, in the two-stage process, an incentive to maximize the recovery to the class. We think that was adequately and fairly done in this case. And so whatever you do to fees in this case, that aspect of the settlement, the substantive aspect of the settlement should not be disturbed and should be affirmed. Mr. Hocklin, one quick factual question. These bottles of pills, how much do they sell for? So that's, it depends on the size, there's a broad range. In the complaint it says from $5 to $50. The plaintiff's worked off, this was the plaintiff's view, that the average price was somewhere around $20 to $25 per bottle. And the percentage of recovery per bottle was built off of that assumption. So the $3, if you don't recall, is $3. $3 is roughly 15% of $20, roughly 12% of $25, and of course, it's not just $3 because you can claim, each person was entitled to claim up to $4, but as a percentage matter, obviously that wouldn't change. Thanks. Okay. Thank you, Mr. Hocklin. Mr. Frank? Defendants say that they're willing to create this cap because they think the district court will reduce the fees based on what the class actually recovers. That's contradicted by their own arguments in this case, where they repeatedly told both this court and the lower court that the amount the class actually recovers is irrelevant. Now they've stepped back off of that because Redmond and Eubank say otherwise, but on pages 22 to 23 of their brief in this court, and what they said below, judge, you don't even need to look at that. You can just approve the settlement because we made it available. Because he did what? Made it available to the class. Oh, the availability, that's, you know. Now we're not alleging that there's a smoke-filled room of collusion, how can we ruin the class's rights to recover? We're not even saying that the settlement, that the claims process has to be the simplest possible. We're just, and we're not even saying that the defendants couldn't take this allegation of $100 million of damage and settle it for $6.5 million. At arm's length negotiation, they decided that these claims are only worth pennies on the dollar, so be it. But if they're going to settle it for $6.5 million, the class should be getting more than $900,000 of that. They should be getting a proportionate share of that. And even if that's the case, that in the real world, the claims are even worth less than $6.5 million and the defendants are overpaying, that windfall should not accrue solely to class counsel. I'm happy to answer any other questions you have. Okay, well thank you very much, Mr. Frank. We thank Mr. Feldman and Mr. Hochman as well. So our next case for our